In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 06-2022

MIRANDA SHADDAY,

*Plaintiff-Appellant*,

*v.*

OMNI HOTELS MANAGEMENT CORPORATION,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:04-CV-1219—**John Daniel Tinder**, *Judge*.

_____

ARGUED NOVEMBER 9, 2006—DECIDED FEBRUARY 20, 2007

_____

Before BAUER, POSNER, and FLAUM, *Circuit Judges*.

POSNER, *Circuit Judge*. This diversity tort suit charges the owner of a hotel in Washington, D.C. with negligence in having failed to prevent the rape of the plaintiff, a guest at the hotel, by another guest. The district judge gave summary judgment for the defendant. The parties agree that District of Columbia law governs the substantive issues.

The plaintiff is a young woman employed in a casket factory. A member of the steelworkers union, she attended a "Women in Steel" union conference at the Omni Shore-

ham Hotel, a large, high-class hotel in a nice part of Washington (near Connecticut Avenue, Rock Creek Parkway, and the National Zoo). In the bar of the hotel, the first night of her stay, she met and had drinks with a seemingly very respectable Guatemalan lawyer—he was visiting Washington as a member of a delegation that included that country's president. The bar closed at 1 a.m. and the patrons repaired to the lobby, where at 2 a.m., as the plaintiff was waiting in front of a bank of elevators to return to her room, the lawyer accosted her and began kissing and fondling her. She resisted, but didn't cry out, because there was no one in sight. She fought her way free, and, an elevator having arrived, she ran into it, but he followed her and raped her in the elevator. She got out at the next floor and was discovered by a security guard. The rapist was soon arrested. He did not deny the crime, and he was convicted of sexual assault.

At the time of night when the rape occurred, the Shoreham normally had three security guards on duty—one in the lobby, one monitoring the security cameras, and one patrolling other parts of the hotel. On the night of the rape, however, one of the security guards was sick and the other two were patrolling, so there was no guard either in the lobby or monitoring the cameras. Anyway there was no security camera trained on the area in front of the bank of elevators, or in any of the elevators; nor, had all three guards been on duty, would any of them have noticed the initial assault unless they happened to be near the bank of elevators.

A hotel or other innkeeper ("inn" remains the legal term for a hotel, motel, bed and breakfast, or other lodging place) has a duty to use due care to protect its guests against foreseeable hazards, including criminal acts. E.g.,

*Wassell v. Adams*, 865 F.2d 849, 855 (7th Cir. 1989); *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1557-58 (7th Cir. 1987); cf. *Doe v. Dominion Bank of Washington, N.A.*, 963 F.2d 1552, 1560-61 (D.C. Cir. 1992) (D.C. law) (duty of landlord to protect tenant). To state the test in somewhat more practical terms, eschewing legal jargon, the hotel has a duty to take precautions that are reasonable in relation to the likelihood that without them guests will be victims of criminal acts. *McAvey v. Lee*, 260 F.3d 359, 373-74 (5th Cir. 2001); *Kveragas v. Scottish Inns, Inc.*, 733 F.2d 409, 413-15 (6th Cir. 1984). The duty is imposed by tort law, but like liability for medical or legal malpractice is most intuitively understood as an implied term in the contract between injurer and victim. Hotel guests, patients, and clients would want to buy, and hotels, doctors, and lawyers would want to sell (as part of the bundles of services for which they charge), that level of protection that confers a value greater than its cost. Tort law codifies their understanding by imposing liability on injurers who, having a contractual relation with their victims, could, in principle, negotiate a standard of care explicitly, along with the other terms of their contractual relation. This codification, sparing the parties the bother of an explicit negotiation, makes particularly good sense in cases such as this (also cases of medical, but not legal, malpractice) in which the injury is nonpecuniary; for it is tort law rather than contract law that has evolved remedies tailored to such injuries.

We can get a better sense of a hotel's duty to protect its guests against crimes by observing that the hotel has much better access to information about the danger than its guests do. *McCarty v. Pheasant Run, Inc.*, *supra*, 826 F.2d at 1558; Ellen M. Bublick, "Citizen No-Duty Rules: Rape

Victims and Comparative Fault," 99 *Colum. L. Rev.* 1413, 1422-23 (1999). The information enables the hotel to take appropriate precautionary measures; the absence of information makes it difficult for the guests to do so. This is the basis of the rule in some states (but by no means in all, see, e.g., *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 161-63 (4th Cir. 1988); *Pittard v. Four Seasons Motor Inn, Inc.*, 688 P.2d 333, 338-39 (N.M. App. 1984)—and not in the District of Columbia) that a hotel or other "innkeeper" has an elevated standard of care toward its guests. *McCarty v. Pheasant Run, Inc.*, *supra*, 826 F.2d at 1558; *Taboada v. Daly Seven, Inc.*, 626 S.E.2d 428, 434-35 (Va. 2006); see generally Daniel M. Combs, Casenote, "*Costos v. Coconut Island Corp.*: Creating a Vicarious Liability Catchall Under the Aided-By-Agency-Relation Theory," 73 *U. Colo. L. Rev.* 1099, 1136 (2002).

The District of Columbia (along with California, see *Wiener v. Southcoast Childcare Centers, Inc.*, 88 P.3d 517, 523-24 (Cal. 2004)) goes to the other extreme and requires a "heightened showing of foreseeability" of plaintiffs who seek to impose liability on a third party who failed to prevent a criminal's attack. *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641-42 (D.C. 2005) (en banc); *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997); *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425, 428-29 (D.C. 1993); *Smith v. District of Columbia*, 413 F.3d 86, 109 (D.C. Cir. 2005) (D.C. law); *Workman v. United Methodist Committee*, 320 F.3d 259, 263-64 (D.C. Cir. 2003) (same); *Doe v. Dominion Bank of Washington, N.A.*, *supra*, 963 F.2d at 1560 (same). These cases do not involve hotels, however, and they invoke the rather old-fashioned formula that a criminal act, being deliberate, is an "intervening" or "supervening" cause that severs the "causal

chain" that would otherwise connect the negligence of the party who failed to prevent the criminal act to the injury to the victim. This is legal mumbo-jumbo. The practical question (and law should try to be practical) is whether the defendant knows or should know that the risk is great enough, in relation to the cost of averting it, to warrant the defendant's incurring the cost. "And so a hospital that fails to maintain a careful watch over patients known to be suicidal is not excused by the doctrine of supervening cause from liability for a suicide, any more than a zoo can escape liability for allowing a tiger to escape and maul people on the ground that the tiger is the supervening cause of the mauling. In both cases there is a foreseeable, in the sense of probable, hazard which precautions can and should be taken in order to lessen." *Jutzi-Johnson v. United States*, 263 F.3d 753, 756 (7th Cir. 2001) (citations omitted).

The invocation of "intervening" or "supervening" cause as a bar to liability is related to the common law's traditional reluctance to impose a duty to rescue a stranger in distress. There is no tort liability for failing or refusing to be a Good Samaritan, as the cases say, and there are reasons for this rule. *Stockberger v. United States*, 332 F.3d 479, 480-81 (7th Cir. 2003). But the hotel guest is not a "stranger," in any sense relevant to liability, to the hotel any more than the patient is a stranger to the hospital or a zoo's visitor is a stranger to the zoo. See *id.* at 481-82. The hotel guest entrusts his safety to the hotel; you do not entrust your safety to a bystander, counting on him to protect you from assaults.

So we have our doubts whether the District of Columbia courts would actually require a hotel guest to make a "heightened showing" that the hotel should have fore-

seen and prevented a criminal attack. A further reason to doubt this is that the District of Columbia cases mainly involve tenants, and a tenant, not being a transient, is likely to have more information than a hotel guest about the risk of crime and a greater ability to protect himself from it. But we shall see that it would not change the outcome if those courts would insist on the heightened showing in this case.

Under any standard (for in any event it is doubtful how much the different articulations of the standard of care in cases of liability for failing to prevent a criminal assault influence the actual outcomes of the cases), the greater the likelihood of a crime against a hotel guest, the more extensive are the measures that the hotel is required to take, because the greater the likely benefits of its doing so. Laura DiCola Kulwicki, Comment, "A Landowner's Duty to Guard Against Criminal Attack: Foreseeability and the Prior Similar Incidents Rule," 48 *Ohio St. L.J.* 247, 263-64 (1987). Ideally, the hotel should increase its expenditures on security until the last dollar buys a dollar in reduced expected crime costs (the cost if a crime occurs, discounted by the probability that it will occur) to the hotel's guests. Of course, this optimal point can't actually be ascertained by the methods of litigation, or by the hotel industry for that matter—there is too much uncertainty. But with the aid of expert and other testimony, a trier of fact may be able to approximate it, albeit crudely.

The major risk of crime to guests of a hotel, especially guests of a fancy hotel like the Washington Shoreham (the American Automobile Association gives it four diamonds out of a possible five, and so it rates as a luxury hotel; it charges $350 to $400 a night for a room) is from intruders, not from staff or guests. See, e.g., *Banks v. Hyatt Corp.*, 722 F.2d 214, 225-26 (5th Cir. 1984). That risk places on the

hotel a tort duty of maintaining a reasonable perimeter defense to prevent the initial intrusion, and also an inner, back-up defense in case the intruder manages to get inside the hotel. Locked outside doors, safes, keycards, a brightly lit exterior, surveillance cameras, and security guards both in the lobby and patrolling the hallways are commonly used methods of protecting the hotel's guests from criminals who try to enter the hotel to prey on them.

It might seem that the better the neighborhood in which the hotel is located, the fewer the precautions against intruders that it need take. So some cases assume. *Doe v. Dominion Bank of Washington, N.A.*, *supra*, 963 F.2d at 1560; *McAvey v. Lee*, *supra*, 260 F.3d at 373-74; *Banks v. Hyatt Corp.*, *supra*, 722 F.2d at 225-26. But maybe incorrectly. The ritzier hotels have wealthier guests, who are juicier targets for thieves. Thus in *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 161 (4th Cir. 1988), "evidence at trial indicated that motels with relatively more affluent clienteles, judged by reference to room rates, were the preferred targets." One reason better neighborhoods have lower crime rates is that they're better protected because they are bigger potential targets for criminals.

Did the Shoreham take precautions commensurate with the danger to its guests from criminals? It is doubtful that such a question can be answered without the aid of expert testimony, evidence concerning regulations imposing security standards on hotels, recommendations by police or by security consultants, or evidence of industry standards. Although an industry's standard of care is not dispositive of due care, *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 967-68 (7th Cir. 1983); *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 382-83 (9th Cir. 1992); *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (L. Hand, J.), it is

highly probative in a case in which the tort plaintiff is a customer of the defendant, for sellers of products and services, including hotels, have market incentives to avoid injury to their customers. Cf. *Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F.2d 880, 889 (7th Cir. 1993); *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1028-29 (7th Cir. 1982); *Keller v. United States*, 38 F.3d 16, 25 (1st Cir. 1994). A hotel that gets a reputation for being dangerous, like a hotel that gets a reputation for serving tainted food or being infested by bedbugs, will lose customers, or at least have to lower its rates.

No evidence was presented concerning the safety precautions customarily taken by luxury hotels in Washington. It is one thing for a jury unaided by expert testimony, empirical data, or other fruits of exact inquiry to assess the care with which the defendant in an automobile accident case drove, for that is something with which almost all jurors are familiar; it is another thing for a jury to determine the right standard of care to which to hold a hotel. The plaintiff did have an expert witness, but he didn't substantiate his opinion concerning the amount of care that the Shoreham should have taken to protect its guests from criminal assaults by other guests. He did not compare the Shoreham's security precautions with those taken by comparable hotels in comparable neighborhoods (such as Georgetown) in Washington, or elsewhere. (Compare the testimony of the expert on hotel security in *Crinkley v. Holiday Inns, Inc.*, *supra*, 844 F.2d at 161-62.) Nor, though the amount of care to take is a function of the danger that care would avert, did he assess the danger that the Shoreham's guests faced of being attacked inside the hotel. There had been intruders into the hotel from time to time, though how often the record does not indicate. But there had been only one incident in which a

guest had engaged in unlawful behavior—the guest had exposed himself to an employee of the hotel and had been quickly expelled. There had been no reported incidents at all of crimes committed by staff against guests.

The plaintiff's expert did testify that within a 2000-foot radius of the hotel there had been in the three years preceding the rape a total of 637 criminal acts. But he didn't compare the number with the amount of criminal activity in comparable areas either elsewhere in Washington or in other cities. He also did not indicate how many of the 637 crimes had occurred in the Shoreham's immediate neighborhood. (Manhattan's Upper East Side is very safe, but it is only blocks from Harlem.) That is, he did not justify his choice of a 2000-feet radius. Rock Creek Parkway is much closer than that to the Shoreham, but it is very difficult to cross the parkway; the other side is not in the same neighborhood, though within the 2000-foot radius. (A sense of the diversity of neighborhoods within 2000 feet of the Shoreham can be glimpsed, at least by those readers familiar with Washington, in the following satellite photo; the "thumbtacks" are points on the circumference of a circle, centered on the Shoreham, having a 2000-foot radius.) To his credit, he did break down the crimes into various categories, but they are too broad to enable a responsible estimate of how many of the 637 incidents might have imperiled guests of the Shoreham.



At most, moreover, crime conditions in the Shoreham's neighborhood are relevant to the risk of a criminal intrusion into the hotel, not to the risk posed by one hotel guest to another. If the Shoreham's experience was typical, and there is no evidence it was not, the latter risk was so minuscule that *no* precautions had to be taken in order to avoid liability. The assault on the plaintiff was as unexpected as the attack on the guest at another hotel by a rabid mongoose. *Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc.*, 124 F.3d 47, 51 (1st Cir. 1997).

Nor is it clear what precautions against guest-on-guest crime would be feasible. Obviously a perimeter defense has no value against a criminal guest. And a hotel could hardly be required to have security guards watching every inch of the lobby every second of the day and night. A security camera trained on the bank of elevators would have been ineffective to prevent the rape. The video of the struggle outside the elevators might not have revealed its involuntary character, and anyway by the time a security guard had been alerted by the video and reached the bank of elevators, the plaintiff and her assailant would have been inside the elevator. Had there been a security camera there, the rape would have been completed long before a guard, alerted by what the camera showed, would have arrived on the scene, though a video recording of the rape might have assisted in the prosecution of the rapist or in any civil action brought by the victim against him.

There is an analogy to employers' liability under Title VII of the Civil Rights Act for sexual harassment by coworkers of the harassed employee. Employers are not strictly liable for such misconduct because they cannot feasibly maintain continuous surveillance of their entire

workforce. They are liable only when they know or have reason to believe that such harassment is occurring and they fail to take effective measures to stop it. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759 (1998); *Erickson v. Wisconsin Dept. of Corrections*, 469 F.3d 600, 606 (7th Cir. 2006). A hotel's relation to its guests is similar. The hotel cannot keep them under continuous surveillance— they would be unwilling to surrender their privacy so completely. The hotel becomes liable for guest-on-guest crime only when it has some reason to think such crime likely. The Shoreham had no reason to think that one of its guests would rape another one in the hotel's elevator.

The hotel would probably not be liable even if the plaintiff had proved that, had it not been for the defendant's failure to exercise due care, she would not have been injured. The injury must be of the kind that the duty of care was intended to prevent. E.g., *De Haen v. Rockwood Sprinkler Co.,* 179 N.E. 764, 766 (N.Y. 1932) (Cardozo, C.J.); *Gauger v. Hendle*, 349 F.3d 354, 363 (7th Cir. 2003); *Carter v. United States*, 333 F.3d 791, 797 (7th Cir. 2003), and cases cited there; *Restatement (Second) of Torts* § 281 comment f (1965). In the granddaddy of these cases, *Gorris v. Scott*, 9 L.R.-Ex. 125 (1874), the plaintiff's sheep were washed overboard in a storm, and the plaintiff sued the owner of the ship, who had failed to install pens in which to hold the animals on their journey, as required by the Contagious Diseases (Animals) Act of 1869. Had the pens been installed, the sheep would have been saved. But the statute's purpose was merely to prevent infection, not to save the animals from a watery death. So the plaintiff lost. In deciding how much care to take to comply with the statute, the shipowner was unlikely to foresee and therefore consider the remote possibility that the pens would

avert a different and highly improbable harm to the animals. In the present case, similarly, in deciding how many precautions to take against intruders the hotel would hardly be thinking about the incremental value of those precautions to guests endangered by other guests, since guest-on-guest crime at a hotel like the Shoreham appears to be vanishingly rare. (Compare that danger in the special kind of hotel that we call a maximum-security prison.)

Of course the precautions against guest-on-guest crime are not dramatically different from the precautions against intruder crime, though the latter have a perimeter dimension that the former do not. But the same was true in *Gorris*. The pens were designed to prevent contagion, but apparently even without being strengthened they could keep sheep from being washed overboard.

The Second Circuit has suggested that the principle of the *Gorris* case should be limited to cases in which, as in *Gorris* itself, the standard of care is set by a statute rather than by a common law doctrine: "At common law, so long as the plaintiff category is foreseeable, there is no requirement that the risk of injury to the plaintiff, and the risk of the harm that actually occurred, were what made the defendant's actions wrongful in the first place. With statutory claims, the issue is, instead, one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the 'mischief' the statute sought to avoid." *Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 237 (2d Cir. 1996); see also *Freeman v. United States*, 509 F.2d 626, 630 (6th Cir. 1975). It is unclear why those things should matter. The violation of a statutory standard of care is negligence; so is a

violation of a common law duty of care. In either case, the puzzle of the line of cases that descends from *Gorris* is why the defendant, having been negligent, should get off scot-free just because the harm that would have been averted had he been careful was not foreseeable. No doubt the framers of the Contagious Diseases (Animals) Act made no judgment that the cost of pens was less than the expected cost of a mass drowning of unpenned animals, but that seems irrelevant. Given that the ship-owner was under a legal duty to pen the sheep, why should he not be liable for a disaster that would have been averted if only he had complied with his duty?

Like other doctrines that truncate liability for negligence, the doctrine of *Gorris* seems to reflect judicial anxiety that negligence liability is potentially too encompassing. As people don't have complete control over their actions, or firms over their employees (for whose negligence committed within the scope of their employment the employer is strictly liable by virtue of the doctrine of respondeat superior), much negligence liability is strict—the careless accident was in fact unavoidable—and the risk of an unavoidable liability that might be crushing gives the courts pause. To visit unpredictable consequences on negligent behavior is unlikely to make potential injurers more careful, because by definition of "unpredictable" they can't reckon the costs of not taking more care. So they do nothing, and so safety is unaffected. But because of the strict-liability element in negligence, a careful person or firm would sometimes be forced to pay a judgment, perhaps a very large one, that could not have been avoided at reasonable cost because, although adjudged negligent, the defendant had in fact used due care. The negligence might have been that of an employee

whom the defendant had carefully screened, supervised, and monitored, all to no avail.

This analysis is far from a conclusive vindication of *Gorris*, but the District of Columbia appears to regard the case with approval, *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268, 1274-75 (D.C. 1987); *Whetzel v. Jess Fisher Management Co.*, 282 F.2d 943, 947-48 (D.C. Cir. 1960) (D.C. law), though how far it would press its doctrine in a case such as this is uncertain. No matter. For reasons stated earlier, the plaintiff failed to present enough evidence to establish a genuine issue concerning the sufficiency of the care exercised by the hotel to protect its guests against the kind of outrage that befell her. The district judge was therefore right to grant summary judgment for the defendant.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*