# United States Court of Appeals
## For the First Circuit

No. 16-2293

HENRY MU,
Plaintiff, Appellant,

v.

OMNI HOTELS MANAGEMENT CORPORATION, a/k/a Omni Hotels,
Defendant, Appellee,

JOHN DOES 1-20,
Defendants.

No. 16-2442

HENRY MU,
Plaintiff, Appellant,

v.

OMNI HOTELS MANAGEMENT CORPORATION, a/k/a Omni Hotels;
JOHN DOES 1-20

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Patricia A. Sullivan, U.S. Magistrate Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Jesse W. Duarte, with whom Duarte & Obolensky Law, LLC was on
brief, for appellant.

          Geoffrey W. Millsom, with whom Brenna Anatone Force and Adler
Pollock & Sheehan P.C. were on brief, for appellee.

_____

February 7, 2018

_____

**TORRUELLA**, **Circuit Judge**.  During the early hours of August 24, 2014, an unidentified group of individuals assaulted Appellant Henry Mu ("Mu") in the lobby of the Omni Providence Hotel (the "Hotel"), which Appellee Omni Hotels Management Corporation ("Omni") operates.  Mu sued Omni for negligence.  The district court granted summary judgment to Omni, finding Mu's claims deficient with respect to three elements of negligence: duty, breach, and causation.  We, however, conclude otherwise, finding that Mu's negligence claim was sufficient to withstand summary judgment.  Accordingly, we reverse the district court's order granting summary judgment to Omni.

## I.  Background

We view the facts in the summary judgment record in the light most favorable to Mu, and draw all reasonable inferences in his favor.  See Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 26 (1st Cir. 2004).

### A. Factual Background

During the relevant period of time, Mu lived in "The Residences," a luxury condominium complex adjoined to the Hotel. As the owner of a condo at The Residences, Mu enjoyed access to a number of the Hotel's services and amenities, including its fitness center and valet parking service.  As a result, Mu visited the Hotel on a near-daily basis.

On August 24, 2014, at 2:10 a.m., the Hotel's front desk received a call complaining of a party on the fourth floor. According to the Hotel's records, the caller expressed his belief that "the kids are smoking pot in the next room." The caller further indicated that the room's occupants were "being very loud," and that "there are more loud teenagers on the 25th floor." In response to this call, two Hotel security guards knocked on the door of room 407 of the Hotel, where they encountered approximately twenty individuals inside. The room's registered guest was not among these individuals, and the Hotel does not allow multiple unrelated people to occupy a room when a registered guest is not present. Therefore, the two security guards evicted the room's occupants from the Hotel, escorting them off the premises. The security guards then returned to the Hotel.

During this time, the Hotel's valet, Danny Lebrón ("Lebrón") was working in front of the Hotel. He observed "approximately a dozen young people (mostly male) leave the front door of the hotel with hotel security behind them." Lebrón watched the group leave the Hotel's property, and walk down the street and out of his sight. But, according to Lebrón, the group, now having obtained a case of beer, soon returned to the Hotel's driveway, where they "were being rowdy." Lebrón watched a fight break out between members of the group, "with punches thrown and much

-4-

shouting."  After the fight had concluded, Mu came down from his condominium to the Hotel's driveway to wait for his girlfriend, who was coming to see Mu and intended to valet her car.

Mu chatted with Lebrón while he waited for his girlfriend to arrive.  As he stood in front of the Hotel, Mu observed a "bunch of kids" coming in and out of the front door to the Hotel's lobby. He then observed this group -- which he estimated to have roughly twenty members -- "trying to get into an altercation with [another] kid."  These efforts included the group using racial epithets against that individual, whom Mu described as African-American. The target of the group's harassment ultimately walked away from the group and out of Mu and Lebrón's sight, but the group pursued him.  Mu then told Lebrón to go get help, but Lebrón responded "[T]hat's not my problem."  Next, Mu heard what "sounded like some type of fight . . . or an altercation going on."  Afterwards, the group of kids "all c[ame] . . . storming out . . . celebrating . . . like they just beat up some kid."  Lebrón then left Mu to park a car, and Mu, fearing for his own safety, made towards the Hotel's lobby.

Mu entered the lobby, and the group of kids stormed in behind him.  Mu informed the concierge that the group was fighting outside, and told her that she needed to eject them from Hotel's property and call the police.  The group then confronted Mu and

began to punch, shove, and kick him. Mu estimates that between five and seven members of the group participated in attacking him. Ultimately, two members of the group held him down, and a third threw a table at him. The group then fled. Mu remembers one of Hotel's employees -- either a security guard or a doorman -- urging him to go home. Though Mu wanted to stay at the Hotel to speak to the police, whom he believed to be en route, he ultimately acquiesced and went home. A doctor later diagnosed Mu with a broken arm.

Mu returned to the Hotel the day after his assault.[1] The Hotel's head of security, Shannon Earle ("Earle"), informed Mu that while the police had come to the Hotel following his assault, Mu would have to contact the police himself to make a report. Mu also inquired about the security cameras in the Hotel's lobby, where the assault occurred. Earle responded that because of ongoing construction, the cameras had not been working. Indeed, the security shift report from that date indicates that six of the Hotel's security cameras were non-functional. The record, however, does contain some indicia to the contrary. One of the

---

[1] Mu's attack took place between 2:00 and 3:00 a.m. on August 24, 2014, and he went home afterwards. Mu stated in his deposition that he returned to the Omni "the next day." While not material to the issues before us, we note that the record is unclear as to whether Mu returned to the Omni later on the 24th, or on the 25th.

on-duty security guards at the time of Mu's assault prepared an incident report on August 24, 2014, which Earle reviewed on August 29, 2014. That report explains that "[c]amera footage from DVR 1 from the times stated were [sic] inconclusive as to what exactly had occurred and was also not able to properly identify any individuals involved."

**B. Procedural History**

Mu filed a complaint in Rhode Island Superior Court on April 14, 2015, alleging negligence against Omni and battery against his unknown assailants. On May 7, 2015, Omni filed a notice of removal to federal court in the District of Rhode Island, based on the parties' diversity of citizenship. See 28 U.S.C. § 1332. Mu did not challenge removal. Both parties consented to jurisdiction by a United States magistrate judge, and Omni then moved for summary judgment.

After a hearing -- during which Mu indicated that he did not intend to pursue his battery claim -- the magistrate judge sitting as the district court granted Omni's motion for summary judgment. The district court first held that because his attack was not foreseeable, Omni had no legal duty to prevent the harm that Mu suffered. According to the court, Mu also failed to provide sufficient evidence establishing the applicable standard of care and Omni's breach of that standard. So too, the district

court added, did Mu fail to "demonstrate that his injury was the 'natural and probable' consequence of any specific act of alleged negligence."

The district court also dismissed Mu's argument that the incident report referring to "[c]amera footage from DVR 1," combined with Omni's contention that no footage of Mu's assault existed, suggested that Omni had despoiled that evidence. Rather, it explained that "[w]hile the record is confusing, Plaintiff's evidence permits the inference that whatever cameras the [Hotel] may have had surveilling its premises were not adequate to record the incident."

After granting summary judgment for Omni, the district court gave Mu thirty days to show cause as to why summary judgment would not also be proper against the still-unidentified defendants to his battery claim. See Fed. R. Civ. P. 56(f). Mu did not respond to that order. The district court therefore entered a final judgment dismissing Mu's claims against all defendants. Mu appeals that judgment.

## II. Analysis

We review a district court's grant of summary judgment de novo, construing the facts and making all reasonable inferences in favor of the nonmoving party. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010). "Summary judgment

is appropriate if there is no genuine issue as to any material fact and the undisputed facts show that the moving party is entitled to judgment as a matter of law." Id. (citing Fed. R. Civ. P. 56(c)(2)) An issue is "genuine" when a rational factfinder could resolve it either direction. Id. A fact is "material" when its (non)existence could change a case's outcome. Id. at 5.

Because this is a diversity case, Rhode Island law provides the substantive rules of decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). The law of Rhode Island is not anomalous in that "[i]n setting forth a negligence claim, 'a plaintiff must establish a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage.'" Berard v. HCP, Inc., 64 A.3d 1215, 1218 (R.I. 2013) (quoting Holley v. Argonaut Holdings, Inc., 968 A.2d 271, 274 (R.I. 2009)).

On appeal, Mu argues that the district court erred in holding that, for summary judgment purposes: (1) Omni owed him no legal duty; (2) he failed to make out the relevant standard of care and show a breach of that standard; (3) he failed to show causation; and (4) his allegations of evidentiary spoliation did not warrant a negative inference in his favor.[2]

---

[2] Mu appeals the district court's entry of judgment on his

## A. Omni's duty towards Mu

We first address the district court's determination that Omni did not owe Mu any duty of care. In Rhode Island, the existence of a legal duty is a pure question of law. Volpe v. Gallagher, 821 A.2d 699, 705 (R.I. 2003) (quoting Kuzniar v. Keach, 709 A.2d 1050, 1055 (R.I. 1998)). Because no "clear-cut formula . . . exists for making this determination," courts employ an ad hoc approach to deciding whether a particular duty exists. Id. (internal quotation marks omitted). The Rhode Island Supreme Court has highlighted five relevant factors to consider:

> (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.

Gushlaw v. Milner, 42 A.3d 1245, 1256-57 (R.I. 2012) (quoting Ferreira v. Strack, 652 A.2d 965, 967-68 (R.I. 1995)). The "relationship between the parties" is also relevant, though it is

---

negligence claim against Omni and his battery claim against his unidentified assailants. However, Mu indicated before the district court that he did not intend to pursue the battery claim, failed to respond to the district court's show cause order, and does not address that claim in his brief here. We therefore treat Mu's battery claim as abandoned. See Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011).

-10-

not entirely clear how it interacts with these five factors.[3]  See id. at 1256-57 (quoting Selwyn v. Ward, 879 A.2d 882, 887 (R.I. 2005)).  Indeed, in cases involving liability for the acts of a third party, courts take into account whether a "special relationship" existed either between the defendant and the third party or the defendant and the victim of the third party's conduct.  Id. at 1256 (quoting Santana v. Rainbow Cleaners, Inc., 969 A.2d 653, 658 (R.I. 2009)).

Among the factors relevant to this analysis, foreseeability is the "linchpin in determining the existence of any duty."  Splendorio v. Bilray Demolition Co., 682 A.2d 461, 466 (R.I. 1996).  And to be clear, "the specific kind of harm need not be foreseeable as long as it was foreseeable that there would be harm from the act which constituted the negligence, provided it was foreseeable that there would be violence toward others."

---

[3]  The district court treated finding a special relationship as a precondition to analyzing the five other factors that Gushlaw sets out.  But, this hierarchy is not particularly clear from Gushlaw itself, or the cases it cites.  See 42 A.3d at 1252-57 (first discussing a special relationship as a necessary condition for liability, then discussing the five factors to consider amid the "ad hoc" duty analysis, and then finally noting that "[t]he 'relationship between the parties' is likewise considered in our duty analysis" (quoting Selwyn v. Ward, 879 A.2d 882, 887 (R.I. 2005))).  We, however, do not need to take up the question of the correct hierarchy of factors here, because it is undisputed that Omni had a special relationship with Mu.

<u>Martin</u> v. <u>Marciano</u>, 871 A.2d 911, 917 (R.I. 2005) (internal quotation marks omitted).

The district court found that Omni did not have a special relationship with Mu's attackers that would make it responsible for their behavior. But, it did find that Omni had a special relationship to Mu as the "possessor of land that holds the land open to the public/member of the public," and because Mu was a member of the public. On appeal, Omni has also conceded as much.

Having found a special relationship, the district court then turned to the question of foreseeability. It characterized the relevant inquiry as whether Omni had "a legal duty to protect [Mu], a member of the public, from an attack spontaneously committed by third parties who followed him from the [Hotel's] driveway area into its lobby." Emphasizing that Mu "presented no competent evidence of any prior criminal activity in or near the [Hotel]," and that it was similarly unforeseeable that "the specific rowdy group evicted from Room 407 would spontaneously attack [Mu] in the [Hotel's] lobby," it declined to find such a duty. Among other things, the district court explained that "throughout the time that Omni was aware of this group, the group committed no crimes or acts of violence resulting in personal injury." It added that "while the [Hotel's] parking valet watched

them punching and chasing each other, they did not interfere with him or any of the [Hotel's] guests he was serving."

In defending the district court's holding, Omni highlights that "Rhode Island courts have not considered whether to impose a duty of care on a hotel to protect against spontaneous criminal conduct by a third party in the lobby." It then cites a handful of cases illustrating, according to Omni, that Rhode Island courts "resoundingly have rejected the proposition that a defendant has a duty to protect persons from harm caused by the spontaneous criminal acts of an unrelated third party, in the absence of strong and direct evidence of foreseeability." See Ouch v. Khea, 963 A.2d 630, 633 (R.I. 2009) (gang-member driver of automobile had no duty to protect gang-member passenger from the intentional criminal acts of a rival street gang); Thanadabouth v. Kongmany, 712 A.2d 879, 879-80 (R.I. 1998) (landlord had no duty to protect tenants from criminal acts of third parties on premises located in high crime area, but on which "no prior criminal activity . . . concerning either party" had taken place); Ferreira v. Strack, 636 A.2d 682, 685-86 (R.I. 1994) (owner of premises abutting a public way had no duty to control traffic, including drunk drivers, on that public way); Banks v. Bowen's Landing Corp., 522 A.2d 1222, 1225 (R.I. 1987) (owner of wharf did not have duty to post signs warning of the danger of diving off of that wharf,

-13-

or to erect barriers to prevent individuals from doing so).  In addition, Omni continues, largely for the same reasons the district court identified, the sequence of events leading up to Mu's attack similarly failed to make that attack foreseeable.  Nothing, Omni asserts, suggested "that the people that attacked Mr. Mu posed a threat to hotel guests or other members of the public."

Mu admits that he did not introduce any evidence of similar attacks in the vicinity predating his own.  But, he avers that evidence of that sort is unnecessary to establish a duty when the record shows that "at least four of Omni's agents were aware of the group's violent and illegal conduct during the thirty-five minute period before the attack."  In arguing that this made his attack sufficiently foreseeable to give rise to a legal duty, Mu brings three decisions from beyond Rhode Island to our attention.

In Gould v. Taco Bell, 722 P.2d 511, 513-14 (Kan. 1986), patrons of a fast food restaurant verbally accosted and then assaulted the plaintiff first inside the restaurant, and then again in the parking lot.  The employee who watched these events unfold resisted calling the police, and only did so after the altercation had spilled outside, and a friend of the plaintiff threatened to jump over the restaurant's counter and call the police herself. Id. at 514. Evidence also indicated that this employee had recognized the plaintiff's attacker from a similar incident at the

-14-

same restaurant two weeks earlier.  Id. at 518.  The court held that the evidence established a "sequence of conduct" sufficient to impose a duty upon the restaurant to protect the plaintiff from the danger that her attacker threatened.  Id. at 516.

Similarly, in Cotterhill v. Bafile, 865 P.2d 120, 122 (Ariz. Ct. App. 1993), the court overturned the trial court's judgment notwithstanding the verdict in favor of the defendant and ordered a new trial to determine the defendant's liability for an assault that occurred at the bar he owned.  The court observed that prior to the fight breaking out, "bad feelings" between the plaintiff and his assailants "persisted for 10 to 15 minutes, including loud and hostile verbal exchanges among several men." Id.  "However," the court noted, "the bartender did not attempt to calm the situation, ask anyone to leave, threaten to call the police[,] or call the police during that time."  Id.  Thus, a "reasonable jury could have inferred that the probability of a fight was evident for several minutes before it occurred, and that the bartender neglected to take reasonable action to avert violence."  Id.

And finally, in Mills v. White Castle System, Inc., 421 N.W. 2d 631, 632 (Mich. Ct. App. 1988), the plaintiffs parked in the defendant's parking lot, where they noticed a group of seven or eight people "drinking alcohol, using obscenities[,] and

-15-

'noticeably acting like disorderly persons.'" Forty minutes later, that group attacked the plaintiffs upon exiting the defendant's business. Id. During the attack, one of the plaintiffs' friends reentered the defendant's business and asked the manager to call the police. Id. But the manager refused, and instructed the friend to use a public phone across the street. Id. at 632-33. The court found that these facts could amount to "a breach of defendant's duty to exercise reasonable care for its invitees' protection," emphasizing that "defendant was in a position to control the unruly patrons' actions or to eject them from its premises." Id. at 634.

By way of comparison, and as became apparent during oral argument, our own decision in Woods-Leber v. Hyatt Hotels of P.R., Inc., 124 F.3d 47 (1st Cir. 1997), also proves instructive here. There, a hotel patron claimed negligence after suffering a bite from a rabid mongoose that had suddenly appeared around the pool area where she lay sunbathing. Id. at 49. We found that unfortunate occurrence to have been unforeseeable to the defendant hotel. Id. at 51. The hotel's staff had never seen a mongoose on the premises before. Id. Nor was anyone at the hotel aware of the presence of mongooses in the nearby mangroves or anywhere else in the vicinity of the hotel.[4] Id. Moreover, this was the

_____

[4] As in Woods-Leber, we assume without deciding that the plural

-16-

first incident in which a wild animal had bitten a guest of the hotel. Id. "Finally, there was no evidence either that a non-rabid mongoose, unprovoked, was likely to bite a supine sunbather, or that rabies was prevalent in the area." Id. That mongoose bite at issue, then, was truly spontaneous.

Woods-Leber and the Rhode Island cases that Omni cites thus pertain to a "past occurrences" theory of foreseeability. The state court cases that Mu cites, in contrast, illustrate a "sequence of events" theory of foreseeability. Omni is correct that Mu's claims would fail under a past occurrence's theory (and Mu also concedes this point). But, it is incorrect that Mu's attack was not foreseeable in light of the sequence of events leading up to it. And, noting the absence of any direct Rhode Island precedent to the contrary, we are confident in our "Erie guess," Whyte v. Conn. Mut. Life Ins. Co., 818 F.2d, 1005, 1011 n.22 (1st Cir. 1987), that Rhode Island's Supreme Court would follow the logic of these cases recognizing that the development of a particular sequence of events can, without more, render future harm foreseeable. See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51-52 (1st Cir. 2008) (endorsing taking

---

of "mongoose" is "mongooses." 124 F.3d at 49 n.1 ("[W]hile we use the term 'mongooses' throughout, we express no opinion on which plural noun is linguistically preferable.").

-17-

into account "precedents in other jurisdictions" and "any relevant policy rationales" in predicting "what path the state court would most likely travel").

Hotel security evicted from the premises a group of youths whose partying had caused a disturbance. This group then obtained a case of beer,[5] and returned to the Hotel's driveway, where valet Lebrón could see them. A fight then broke out among members of the group. Next, the group attempted to pick a fight with a passer-by, hurling racial slurs at him and apparently physically attacking him too. During this time, members of the group -- despite their previous eviction -- circulated in and out

---

[5] While ultimately not dispositive of the question of foreseeability here, it does bear mentioning that the district court misapplied the summary judgment standard to Mu's allegations that his assailants were intoxicated by failing to draw all reasonable inferences in his favor. In rejecting Mu's arguments involving Martin, 871 A.2d at 917 ("melee" foreseeable to social host who served alcohol to underage guests), it concluded that "there is no evidence suggesting that the Room 407 group was underage, and nothing beyond mere speculation to suggest that they were drunk or had been drinking alcohol or that they otherwise fell into a category that presumptively would become violent." But, the phone call to the Omni's front desk that set all of these events in motion complained of a party in Room 407. Additionally, after security evicted them, the occupants of that room returned to the Hotel's premises with a case of beer. This is sufficient to support the inference, for summary judgment purposes, that these individuals had been drinking alcohol. And, even setting aside the question of whether Mu's attackers were minors, "who, by virtue of their tender age and inexperience, are presumed less capable of handling the deleterious effects of alcohol consumption," id. at 916, Mu's attackers' possible intoxication would seemingly have the effect of making his injury even more reasonably foreseeable.

of the Hotel's lobby.  The group's unruly behavior ultimately reached its crescendo when two of its members held Mu down while a third threw a table at him.

Thus, the events leading up to Mu's injury involve crucial differences from the facts of Woods-Leber, where the wild mongoose "[s]uddenly (and without any apparent provocation) . . . scurried into the pool area and bit [the plaintiff]," and the cases Omni cites addressing foreseeability in light of past occurrences. Id. at 49.  Analogizing this case's facts to those of Woods-Leber, it would be as if the hotel had first shooed the mongoose off of the premises, only for it to return and menace others before finally biting the plaintiff.  While Mu's ultimate injury may have been unforeseeable at the time of his attackers' eviction, this certainly changed after a fight broke out within the group and members of the group then turned on a passer-by.  An observer of this sequence of events would not be shocked to discover that the group ended up getting in an altercation with someone in the Omni's lobby -- where members of the group continued to set foot after their eviction.  In sum, the facts here place Mu's foreseeability argument squarely within the realm of cases in which a sequence of events unfolded in such a way to make harm foreseeable and thereby confer a legal duty.  See Cotterhill, 865 P.2d at 122; Gould, 722

-19-

P.2d at 516; Mills, 421 N.W. 2d at 634. And we find this conclusion compatible with Rhode Island law.

Accordingly, contrary to the district court's holding, on the version of the facts most favorable to Mu, the harm he suffered was reasonably foreseeable to Omni. And with the "linchpin" factor of our duty analysis satisfied, see Splendorio, 682 A.2d at 466, we also note that none of the other Gushlaw factors hedge against finding a legal duty here, see 42 A.3d at 1256-57. For example, the "policy of preventing future harm" to individuals in situations comparable to Mu's outweighs the "burden to the defendant and the consequences to the community" that would result from imposing that duty. See id. at 1257. It is far from onerous to expect a hotel to prevent a group of recent evictees, who had demonstrated a propensity for unruly behavior and violence while just outside the hotel (in front of a hotel employee, no less), from assaulting someone in the hotel's lobby. We therefore hold that the district court erred in concluding that the Omni had no legal duty to protect Mu from his attackers.

## B. Standard of care, breach, and causation

Mu also challenges the district court's conclusion that he provided insufficient evidence to establish the applicable standard of care and Omni's breach of that standard. "In a negligence case, a plaintiff must 'establish a standard of care as

well as a deviation from that standard.'"  Morales v. Town of Johnston, 895 A.2d 721, 732 (R.I. 2006) (quoting Sousa v. Chaset, 519 A.2d 1132, 1135 (R.I. 1987)). In the premise liability context, an owner or possessor of property must "exercise reasonable care for the safety of persons reasonably expected to be on the premises."  Habershaw v. Michaels Stores, Inc., 42 A.3d 1273, 1276 (R.I. 2012) (quoting Kurczy v. St. Joseph Veterans Ass'n, 820 A.2d 929, 935 (R.I. 2003)).  This includes "protect[ing] against the risks of a dangerous condition existing on the premises, provided the landowner knows of, or by the exercise of reasonable care would have discovered, the dangerous condition."  Id.  Finally, under Rhode Island law, expert testimony is not necessary to establish the relevant standard of care when that standard would be obvious to a layperson.  See Foley v. St. Joseph Health Servs. of R.I., 899 A.2d 1271, 1277 (R.I. 2006).

The district court appears to have found it unnecessary to determine whether expert testimony was required,[6] concluding

---

[6]  It is somewhat difficult to discern the district court's actual holding on the expert versus lay testimony question.  It first explained that "the standard of care to be imposed on a hotel to protect against generic crime arising in its neighborhood likely requires an expert."  But, it then stated that "there is also no question that a premises-liability plaintiff could establish a standard of care based on lay testimony, if the breach was a matter of common sense."  Finally, the district court "decline[d] to hold that Rhode Island would treat premises-liability cases as it does professional malpractice cases, for which expert testimony is always required to establish the standard of care."  How best to

-21-

that, in any event, Mu's "standard of care proffer [was] deficient as a matter of law." Specifically, the district court stressed that Mu pointed only to "his own testimony regarding what he thinks the Omni should have done." That testimony, in turn, was insufficient, as the "fixes" Mu suggested "are all either measures that the [Hotel] did have in place (having security guards on the premises, having adequate communication to summon the security guards, calling the security guards when the situation became violent) or are precautions that he concedes would not have prevented his injury (working surveillance cameras)."

Omni argues before us that expert testimony is necessary here to establish the proper standard of care. It points to three cases addressing expert testimony in the context of premise liability and crime prevention. First, Shadday v. Omni Hotels Mgmt. Corp., 477 F.3d 511, 512 (7th Cir. 2007), concerned the negligence claim of a hotel guest whom another guest raped in the hotel's elevator. In upholding the district court's grant of summary judgment to the hotel, the Seventh Circuit highlighted that the plaintiff "did have an expert witness, but [that expert] didn't substantiate his opinion concerning the amount of care that

---

construe this passage of the holding, though, is ultimately inconsequential, as we review this question of law de novo. See Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 27 (1st Cir. 2006).

-22-

the [hotel] should have taken to protect its guests from criminal assaults by other guests." Id. at 515. In the second case Omni cites, Lees v. Carthage Coll., 714 F.3d 516, 517 (7th Cir. 2013), the Seventh Circuit considered allegations of negligence stemming from a sexual assault that took place on a college campus. There, the court cited Shadday in holding that "[p]remises-security cases like this one fall within the category of negligence claims requiring expert testimony." Id. at 522. Lastly, in Varner v. District of Columbia, 891 A.2d 260, 265 (D.C. 2006), the District of Columbia Court of Appeals considered whether expert testimony was necessary to make out a wrongful death plaintiff's claim that a university had been negligent in failing to expel a student with an extensive record of infractions who ended up murdering two other students on campus. It concluded that "expert testimony is required to establish the standard of care in negligence cases such as this one, which involve issues of safety, security and crime prevention." Id. at 267.

However, none of these cases are directly on-point, and we decline Omni's invitation to hold that expert testimony was necessary here. Similar to Omni's arguments concerning its duty toward Mu, Omni misstates the relevant inquiry. Unlike the plaintiffs in Shadday and Lees, Mu does not allege that Omni was negligent in allowing any crime to occur on its premises. Rather,

Mu contends that Omni failed to respond adequately to a specific, known threat of a crime against someone on its premises. Varner, in contrast, does pertain to a defendant's response to a known potential threat. However, that case's subject matter is categorically different from Mu's, making it similarly inapposite. "[Q]uestions as to the appropriateness and sufficiency of academic discipline" may well, due to their relative complexity, be "beyond the ken of a lay jury." Id. at 267. Determining whether or not the Omni was negligent in reacting to the threat that its recent evictees posed, however, is a comparatively straightforward endeavor. We do think that a jury would be capable, without an expert's assistance, of determining the proper standard of care and measuring Omni's conduct against that standard.

Furthermore, we disagree with the district court that, for summary judgment purposes, Mu failed to provide sufficient evidence for a jury to have made that determination. First, Mu maintains that after the initial call complaining of a loud party involving teenagers smoking marijuana, the employee who took that call should have called the police, rather than merely dispatching hotel security. Second, after evicting those teenagers, Mu contends that the security guards should have "st[uck] around to ensure no further issues arose," rather than returning to the Omni. Third, Mu argues that Lebrón should have called either hotel

-24-

security or the police -- as Mu urged him to do -- after witnessing both the fight that broke out among the recent evictees and that group's aggressions towards a passer-by.  Mu also contended before the district court that the Omni should have had a security guard stationed in the lobby.

These arguments certainly have the effect of creating a dispute of material fact as to whether Omni adhered to the proper standard of care.  Contrary to what the district court held, a jury would have plenty to consider in deciding what Omni "should have done" and whether it did enough.  See Bitgood v. Greene, 108 A.3d 1023, 1025, 1030 (R.I. 2015) (upholding jury verdict finding defendant bar negligent for failing to call police after initial altercation between patrons when plaintiff injured in subsequent altercation occurring ten to fifteen minutes later).  Accordingly, we hold that the district court also erred in finding Mu's claims insufficient to survive summary judgment with respect to standard of care and breach.

Finally, we also differ with the district court's causation analysis.  Having found that Omni owed no duty to Mu, and that Mu had failed to make out a breach of the proper standard of care, the district court concluded that Mu could not "show that [Omni's] failure to adhere to some applicable standard of care was the proximate cause of his injury."  We think otherwise.

"A plaintiff must not only prove that a defendant is the cause-in-fact of an injury, but also must prove that a defendant proximately caused the injury." Almonte v. Kurl, 46 A.3d 1, 18 (R.I. 2012). Proximate cause, in turn, requires a finding that the harm in question would not have occurred if not for the relevant breach and that the harm was the "natural and probable consequence" of the breach. Id. (quoting Pierce v. Providence Ret. Bd., 15 A.3d 957, 964 (R.I. 2011)). As for making that showing, "[p]roper inferences from other proven facts, when considered in connection with all of the evidence, may satisfy reasonable minds that . . . the injury resulted from the defendant's negligent acts." Kurczy, 713 A.2d at 766.

In light of his arguments as to the standard of care and the steps Omni should have taken to adhere to that standard, Mu has brought forth enough to create a dispute of material fact as to causation. Reasonable minds could be satisfied that were it not for Omni's alleged negligence, the events of the early morning in question would not have culminated in the Omni's recent evictees throwing a table upon Mu inside the Hotel's lobby. Accordingly, we conclude that the district court committed further error in granting summary judgment on causation grounds.

## C. Spoliation

Mu also asserts that Omni's representation that none of the Hotel's security cameras were working during the time of his assault, combined with the incident report explaining that footage of the assault was "inconclusive as to what exactly had occurred," entitled him to an adverse inference against Omni. See Nation-Wide Check Corp. v. Forest Hills Distribs., Inc., 692 F.2d 214, 217 (1st Cir. 1982) (Breyer, J.) ("When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him."). However, having already determined -- without giving Mu the benefit of an adverse inference -- that reversal of the district court's summary judgment order is warranted here, we do not need to reach this question.

## III.  Conclusion

We hold that Omni did have a duty to prevent the reasonably foreseeable harm that Mu suffered.  Mu, additionally, did not need an expert witness to establish the relevant standard of care, and did bring forth sufficient evidence that Omni breached that standard.  Furthermore, a dispute of fact exists as to whether that breach was the cause of Mu's injuries.  Therefore, because

-27-

Mu's negligence claim against Omni was sufficient to survive summary judgment, the district court's order is reversed and the case is remanded to the district court for proceedings consistent with this opinion.

**<u>Reversed and Remanded</u>.**