# United States Court of Appeals
## For the First Circuit

No. 19-1754

JEFFREY BOUDREAU, as Personal Representative of the Estate of
Wendy Boudreau,

Plaintiff, Appellant,

v.

SHAW'S SUPERMARKETS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

Laura H. White and Bergen & Parkinson, LLC on brief for
appellant.
Heidi J. Eddy, Elizabeth G. Stouder, and Richardson, Whitman,
Large & Badger on brief for appellee.

April 10, 2020

**LYNCH**, **Circuit Judge**.  On August 19, 2015, Connor MacCalister attacked and killed Wendy Boudreau with a knife in the ice cream aisle of the Saco, Maine Shaw's Supermarket.  Both Wendy Boudreau and MacCalister were regular customers of the Saco Shaw's.  MacCalister later confessed that she went to Shaw's intending to kill someone and chose Wendy Boudreau because she was elderly and would be unable to fight back.

Two years later, Jeffrey Boudreau, Wendy Boudreau's husband and the executor of her estate, sued Shaw's in federal court asserting wrongful death and conscious pain and suffering under Maine law.  Boudreau asserted that Shaw's owed a duty to protect its patrons from foreseeable harm and that MacCalister's attack was foreseeable.  He further argued that Shaw's breached this duty by failing adequately to monitor the store and that this breach was the proximate cause of Wendy Boudreau's death.  In a separate count, he alleged that Shaw's' breach caused Wendy Boudreau conscious pain and suffering.  The district court entered summary judgment for Shaw's, concluding that Shaw's did not owe a duty under Maine wrongful death law to protect Wendy Boudreau from this attack by MacCalister because it was not foreseeable. Boudreau v. Shaw's Supermarkets, Inc., No. 2:17-cv-259, 2019 WL 3242051, at *1, *14 (D. Me. July 18, 2019).  We affirm.

I.

A.   Facts

We recount the facts in the light most favorable to Boudreau and draw all reasonable inferences in his favor. Roy v. Correct Care Sols., LLC, 914 F.3d 52, 57 (1st Cir. 2019).[1]

1.   The Saco Shaw's

The Saco Shaw's is a grocery store located in downtown Saco, Maine that serves around 15,000 customers per week.[2] It is one of the biggest Shaw's in Maine. The Saco Shaw's served "a very, very diverse clientele with a lot of walkers with backpacks."

The store has two front entrances, one on each side of the store. When a customer enters the store, the produce section is on the far left and the floral department is on the far right of the store. The ice cream aisle is closer to the side of the store with the floral department.

The management personnel of the Saco Shaw's changed several times between 2009 and 2015. John DeRoche was the store manager from 2009 to 2014. An interim manager served for a few months in mid-2014 until Bryan Goodrich took over as the manager

---

[1]   We describe the testimony and incidents involving MacCalister primarily relied upon by Boudreau. For additional detail, we refer the reader to the district court's decision.

[2]   Shaw's conceded at the district court that the knowledge of its employees may be treated as its own knowledge.

around November 1, 2014.  Goodrich was the Saco Shaw's manager at the time of Wendy Boudreau's murder.

2.  <u>MacCalister's Interactions with Shaw's Employees and Customers Before the August 2015 Attack</u>

Connor MacCalister frequently visited the Saco Shaw's in the years before the murder of Wendy Boudreau.  DeRoche recalled first seeing MacCalister in the Saco Shaw's in 2010 or 2011.  He stated that the first time he saw her he was "a little shocked" because of her "really baggy clothes" with a "chain down on her side" and her "shaved head."  During his time at Shaw's, DeRoche never saw MacCalister behave violently, raise her voice, or carrying a weapon at any time inside the Saco Shaw's.  He had no knowledge of her acting strangely in the Saco community.

On May 24, 2011, more than four years before the murder of Wendy Boudreau, two customers complained to DeRoche that MacCalister had scared them outside as they entered the store.  MacCalister had been standing outside of Shaw's by the entrance, smoking discarded cigarettes out of an ashtray and blowing smoke rings from underneath a hood that partially covered her face.  DeRoche promptly went outside to investigate the complaints, saw MacCalister, and recalled that "it looked like something out of a scary movie."  DeRoche stated that usually MacCalister "just looked weird" but on that day "she looked scary" and "frozen."

DeRoche acted on the complaints by calling the police.

He told the police, "can you tell this person I don't want her here anymore."  The police conveyed to MacCalister that she was banned from the Saco Shaw's.  The police also told DeRoche that they had interacted with MacCalister before, that she lived nearby with her mother, and that "her mother is crazier than she is." For a year following this incident, MacCalister was not permitted to shop at the Saco Shaw's.[3]

A year later in mid-2012, MacCalister called DeRoche and asked if she could return to Shaw's.  DeRoche did not realize MacCalister was the caller until he later saw her in Shaw's and asked what she was doing there.  MacCalister told DeRoche that she had called to ask if she could come back.  DeRoche told her that she could return if she did not "cause any problems."

After the May 2011 incident, DeRoche requested that the Shaw's Loss Prevention Department watch MacCalister because she "look[ed] suspicious," but he had never heard any complaint that she shoplifted.  In response to the request, Loss Prevention told DeRoche that they had watched her before and she had "never taken

---

[3]    Boudreau also relies on several phone calls referenced in the affidavit of a Saco police dispatcher.  The dispatcher stated that "[a]fter MacCalister was banned, [he] took dispatch calls from employees of Shaw's who noted that MacCalister had returned to the premises and they were concerned."  We understand these calls to be evidence of Shaw's employees enforcing the ban against MacCalister.  As to the several other calls referenced in the record, we agree with the district court's decision to disregard them because they do not specifically reference MacCalister.

anything." Loss Prevention continued to watch her "a couple more times" but never observed her shoplifting. Nor did they observe any other concerning behavior by her. Warren McCourt, a Shaw's Asset Protection Specialist, also observed MacCalister about four or five times between 2012 and 2014. He stated that her behavior never seemed unusual. McCourt observed MacCalister come into the store, purchase product, and leave.

After the 2011 smoking incident, there were no further customer complaints to DeRoche about MacCalister and no observations by Shaw's employees of MacCalister engaging in scary or concerning behavior. DeRoche specifically stated that "[n]o one ever said a word to [him] about feeling uncomfortable with her in the store or being afraid of her" and that he "didn't have any fear of [his] safety or any of [his] employees' safety when she was in the store."

Goodrich stated that after becoming manager in 2014, "no one ever reported anything to [him] about MacCalister" and he never saw her behaving strangely. Adam Veno, Shaw's assistant store director who started six weeks before the murder, stated that he never saw MacCalister in the store.

Joan Doyle worked as a cashier at the Saco Shaw's from 1997 through 2015. She typically worked midday shifts and estimated that she had seen MacCalister "probably four times" in the Saco Shaw's before 2015. When asked what stood out to her

about MacCalister, Doyle stated "[w]hat she was wearing," which Doyle described as usually a "camouflage outfit." Doyle stated that MacCalister was "very quiet, never said anything" in response to Doyle's greetings, and that this was "pretty unusual for customers." She never heard that MacCalister had bothered a customer. Doyle had heard rumors that MacCalister shoplifted but never observed this herself. She also never observed MacCalister act violently or even speak, nor had she ever seen MacCalister outside of the Saco Shaw's.

Michelle Schaffer worked for Shaw's as a customer service representative beginning in 2011. She estimated that she had seen MacCalister "multiple" times between 2011 and 2015 and stated that MacCalister came into the store "quite often." She described MacCalister as dressing in baggy clothes that were "all black, [with] big jackets, [a] hood . . . [and] dark, black makeup." Schaffer stated that MacCalister's eyes were "big from time to time" and she would "just look at you" in a way that made Schaffer think that she was "on something." Sometimes MacCalister came into the store "shaking." Schaffer stated that "if somebody saw the same thing that [Schaffer] saw," they would think that "something is up with [MacCalister]" but that this was not "out of the norm" in downtown Saco. She stated that she thought MacCalister's appearance and demeanor may have made "some people probably [feel] threatened" and be "a little bit more on guard"

but that she had never witnessed any threatening behavior by MacCalister. She explained that there were "moments" where she "felt probably uncomfortable" or "awkward" around MacCalister but that MacCalister "never did anything directly towards [her]."

Schaffer had heard rumors that MacCalister shoplifted but never observed MacCalister shoplifting. She had seen MacCalister "a couple times" outside of the Saco Shaw's but never saw her behaving strangely. She also never saw MacCalister with a knife inside the Saco Shaw's, nor had she ever witnessed MacCalister act violently or raise her voice.

Brittani Wood worked as a Shaw's cashier beginning in 2013. In 2015, she worked shifts during the "late evening[] into the night" and she recalled seeing MacCalister "[q]uite frequently" at Shaw's and sometimes "more than once in a day." Wood observed MacCalister wearing baggy pants, military clothing, and a backpack and with a shaved head, which Wood described as "strange." She never observed MacCalister carry a weapon, appear angry, or "yell or lunge at another customer." Wood had not heard any rumors that MacCalister shoplifted and stated that MacCalister always bought something when she entered the Saco Shaw's. In her interactions with MacCalister, Wood stated that MacCalister "would acknowledge you were talking to her; but she wouldn't really, like, speak." Wood stated that MacCalister was "quiet" and "shy." Wood had heard customers make comments such as "what's with her or she

seems weird" when referring to MacCalister but no customer ever made a report about MacCalister to Wood.

In the weeks before Wendy Boudreau's murder, MacCalister had several interactions with customers at the Saco Shaw's. These interactions were not reported to Shaw's except as we explicitly note, and even then, they were not reports made to supervisors but verbal comments made to a cashier. The rest of the statements we describe were only made at depositions after this suit started.

First, Debra Surran stated she went to Shaw's in June or July 2015 and estimated she was in the store for about forty-five minutes. While shopping, Surran saw MacCalister at the end of the aisles she was shopping in three separate times, as if MacCalister were following her. MacCalister was not going down the aisles and did not have a cart, which Surran thought was "a little strange." When Surran went to check out, she noticed that MacCalister had gotten in line directly behind her. Surran stated that "Connor was glaring at me, like she really wanted to hurt me" and she looked angry and her jaw was tight. Surran was scared so she grabbed a nearby cart and placed it between herself and MacCalister until MacCalister checked out and left the store.

Before leaving, Surran told Michelle Lavoie, the cashier with whom both MacCalister and Surran checked out, that "there's something wrong with that girl." Lavoie stated "no, no, Connor comes in here all the time. She's fine." Surran repeated that

"there's something wrong with her" and whispered to Lavoie that MacCalister scared her.[4]  Surran did not talk to any other Shaw's employee about the incident.

Lavoie stated that she was familiar with MacCalister and recalled that she had seen her "occasionally from time to time" in the years before 2015.  Lavoie was also familiar with Surran and stated that she often waited on Surran at Shaw's.  When asked about the incident, Lavoie could only recall that Surran was "not thrilled with Connor" based on her "interpretation of [Surran's] body language."  Lavoie explained that with her regular customers, she "can tell sometimes if they're having a good day."  She stated that "with my years of experience, [I think I would have] picked up if [Surran] was uncomfortable.  I didn't pick up on body language that she was on defensive."  Lavoie stated that she did not report the incident to a manager because "it would need something more than just [her] own gut instinct that there was something more going on."  She explained that:

> [i]f I'm not seeing anything out of the norm
> and I'm not getting anything from the customer
> . . . that there was a problem, I'm not going

---

[4]  Surran stated in her affidavit that she "whispered to the cashier . . . that [she] was scared of MacCalister." But later at her deposition, she did not include this fact when recounting what happened.  Counsel for Shaw's asked her if she said anything else to Lavoie and Surran stated, "No.  That was it."  Counsel for Shaw's confronted Surran with her affidavit and Surran stated, "[i]t's basically the same thing, yeah."  Like the district court, we assume favorably to Boudreau that Surran did whisper to Lavoie that MacCalister scared her.

to go any further than what I normally would, other than to wait on her, check her out, and thank her for shopping with us.

In early August 2015, Katherine Corriveau rode her bike to the Saco Shaw's. She saw MacCalister sitting under a tree at the back entrance to the Shaw's plaza. As Corriveau passed, she made eye contact with MacCalister, who was wearing sunglasses. She stated that she "got the willies" and her "alarm bells went off" because MacCalister looked "angry," had a "set jaw," and stood up as Corriveau passed. As Corriveau locked up her bike, she saw MacCalister walking with a "determined gait" toward Shaw's. Corriveau entered the store and about five minutes later, she saw MacCalister about ten feet away from her in the ice cream aisle. Corriveau felt as though MacCalister was following her and "feared for [her] safety" so she went to another aisle. Within a short time, MacCalister appeared in the same aisle. Corriveau then went to the produce section and again saw MacCalister. Corriveau lost track of MacCalister while she finished shopping. She went to check out after spending about thirty minutes at the most in the store and saw MacCalister ahead of her at a different register. MacCalister purchased a Coke and left the store. Corriveau did not tell any Shaw's employee about the incident.

About a week before the murder, Cindy Belanger, another Shaw's customer, noticed MacCalister while waiting in the Shaw's checkout line. MacCalister was "laughing and talking" in a group

- 11 -

of people on the other side of the store.  Belanger stated that when MacCalister noticed Belanger looking at her, MacCalister turned her body, put her arms back, and "lunged" at Belanger without moving her feet while yelling "rah."  Belanger could not hear MacCalister well because she was "too far away."  The act scared Belanger and she "took it as a threat."  She stated that other customers saw the gesture, but that no Shaw's employee seemed to see it.  Belanger checked out, left the store, and did not report the incident to a Shaw's employee.

3.   MacCalister's Behavior on the Day of the Attack

On August 19, 2015, MacCalister visited Shaw's two separate times.  Her first visit was around 12:00 p.m. and did not provide cause for concern to Shaw's.  She wore army fatigues, sunglasses, and a backpack, and she did not use a shopping cart. She checked out with Doyle and purchased a gallon of milk and a couple of other items.  Doyle stated that MacCalister "kind of gave [her] a little smirk when [she] was handing her the receipt" but that she "didn't think too much of it at the time." MacCalister left the store and sat on the ground, almost on the automatic door sensor, for about five minutes.  There is no evidence any Shaw's employee observed this behavior.

Around 3:00 p.m., Wendy Boudreau entered Shaw's, as did MacCalister for the second time that day.  Two Saco EMTs, Jerry and Armand Beaulieu, were shopping in the store at this time.

Armand stated that he and MacCalister "passed each other in the same area a couple of times." He did not "think anything different" about her behavior and stated that she appeared to be shopping. Jerry described MacCalister's behavior as "walking the back row, like she was looking for something . . . she kept going back and forth." He stated that she did not look angry, just that "she was in a hurry, looking for something."[5]

About ten minutes after 3:00 p.m., MacCalister approached Wendy Boudreau, who was alone in the ice cream aisle. She walked up behind Wendy Boudreau and stabbed her multiple times. Wendy Boudreau screamed and that caught the attention of another customer, who pinned MacCalister to the ground. A Shaw's employee who had also gone to investigate the screams attempted to help Wendy Boudreau. Wendy Boudreau was transported to a hospital but did not survive.

MacCalister was arrested by the Saco Police and taken to the Saco Police Department. The police interviewed her around 5:20 p.m. She confessed that she went to Shaw's intending to kill someone. She chose Wendy Boudreau because she was "in the open with no one around [and] couldn't fight back." MacCalister stated

---

[5] Boudreau asserts that two individuals in the security footage of the minutes leading up to the attack are Shaw's employees. Like the district court, we assume in the plaintiff's favor that these two individuals were Shaw's employees and so could have observed what the two EMTs observed.

that she always carried two knives in her pockets.  There is no evidence that the knives were visible to a Shaw's employee before the attack.[6]

B.   Procedural History of the Litigation

Jeffrey Boudreau filed this lawsuit against Shaw's as the personal representative of Wendy Boudreau's estate in federal court on July 10, 2017, alleging causes of action for wrongful death and conscious pain and suffering under Maine law.  He alleged that Shaw's "owed a duty of care to protect its patrons from foreseeable risks of harm on its premises," that Shaw's breached this duty by failing to "adequate[ly] monitor its premises or use existing security measures to protect Shaw's patrons," and that this breach was the proximate cause of Wendy Boudreau's death as well as her pain and suffering.

Shaw's moved for summary judgment, arguing that Wendy Boudreau's murder was not foreseeable because Shaw's had no reason to foresee that MacCalister would violently attack another customer.  Shaw's also argued that there was no evidence that even if Shaw's had watched MacCalister or tried to interact with her, as Boudreau asserted that it should have, that this would have

---

[6]     Boudreau also relies on MacCalister's medical records, her history with the police, and observations of her behavior outside of the Saco Shaw's to support his argument.  As the district court correctly stated, there is no evidence in the record that Shaw's knew about these facts, or that Shaw's should have known any of this information.

prevented the attack.

The district court, in a detailed analysis of the undisputed facts, entered summary judgment for Shaw's, holding that Shaw's did not owe a duty to Wendy Boudreau under Maine law because it was not reasonably foreseeable that MacCalister was a danger to other customers. See Boudreau, 2019 WL 3242051, at *1. The district court explained that despite MacCalister's various interactions with Shaw's employees and customers, she had never been violent at Shaw's and had never displayed her knives at Shaw's. Id. at *12. Further, Shaw's had no knowledge, nor any ability to learn, of MacCalister's behavior outside of Shaw's. Id. Concluding there was no duty under Maine law, the district court did not reach the issue of proximate cause. Id. at *14-15. Boudreau timely appealed.

## II.

We review the district court's grant of summary judgment de novo. River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 36 (1st Cir. 2019). Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As a federal court sitting in diversity, we apply Maine substantive law. See River Farm Realty Tr., 943 F.3d at 36.

- 15 -

A.  Shaw's Did Not Owe a Duty to Protect Wendy Boudreau from MacCalister

Boudreau argues that the district court erred in holding that Shaw's did not owe a duty to protect Wendy Boudreau from harm from MacCalister.  He asserts that he is entitled to a jury trial on this issue, arguing that it is a question of fact.  He further contends that it was foreseeable that MacCalister would harm another customer, "if only Shaw's had been paying attention."  Finally, he relies on Shaw's' purported violation of its own loss prevention policies to argue that Shaw's owed, and breached, a duty to Wendy Boudreau.  We address each argument in turn and conclude that each fails.

First, Boudreau's argument that he is entitled to a jury trial on the issue of duty fails.  "Even though the issue is fact driven, the question of duty is a legal question decided by the court, not the jury."  Brown v. Delta Tau Delta, 118 A.3d 789, 791 (Me. 2015).  Boudreau confuses the issue of whether Shaw's owed Wendy Boudreau the duty alleged with whether, assuming such a duty existed, Shaw's breached that duty.  The issue of breach is a question of fact, Lewis v. Knowlton, 688 A.2d 912, 914 (Me. 1997), but whether a duty exists in the first place is a question of law that we may resolve at summary judgment, see Denman v. Peoples Heritage Bank, Inc., 704 A.2d 411, 413 (Me. 1998) (affirming no duty holding on summary judgment in premises liability case).

- 16 -

We turn to Boudreau's primary argument on appeal: that Shaw's owed Wendy Boudreau a duty because MacCalister's attack was foreseeable. Under Maine law, for "[a] proprietor of an inn, hotel, motel, restaurant, or similar establishment [to be] liable for an assault upon a guest or patron by another guest, patron, or third person," the proprietor must "[have] reason to anticipate such assault." Kaechele v. Kenyon Oil Co., 747 A.2d 167, 170 (Me. 2000) (quoting Brewer v. Roosevelt Motor Lodge, 295 A.2d 647, 651 (Me. 1972)). "A proprietor must guard its patrons against not only known dangers but also those which it 'should reasonably anticipate.'" Id. at 171 (quoting Brewer, 295 A.2d at 651). The defendant need not be able to foresee "the exact nature of the injury which in fact occurred . . . if some harm was reasonably foreseeable under the circumstances." Schultz v. Gould Acad., 332 A.2d 368, 370 (Me. 1975). So, the question here is whether Shaw's "[knew], or should . . . have anticipated, that [MacCalister] would assault a patron on the evening in question." Kaechele, 747 A.2d at 171.

We agree with the district court's conclusion that Maine's law of premises liability is clear that the harm must have been foreseeable. Because we conclude that MacCalister's attack was not foreseeable, we need not address the policy element of Maine's duty analysis. See Brown, 118 A.3d at 792 (stating that

the duty analysis "is a multi-factored analysis that necessarily evokes policy-based considerations").

Kaechele does not support Boudreau's argument that MacCalister's attack on Wendy Boudreau was foreseeable. In Kaechele, the plaintiff presented evidence to show that his assault by another customer of the same convenience store was foreseeable. Kaechele, 747 A.2d at 169. Before the assault, store employees observed the attacker yell obscenities for fifteen minutes, slam the store door, and pound on the store window. Id. Another individual in the store suggested the police be called but no call was made. Id. The Maine Supreme Judicial Court concluded that these facts sufficiently established that the attack was foreseeable. Id. at 173.!

There is no such evidence here. Shaw's first observed MacCalister in early 2010 or 2011, more than four years before the murder. In May 2011, two customers complained about MacCalister because she was standing outside of the Saco Shaw's smoking discarded cigarettes. Shaw's promptly called the police and had MacCalister removed from the store premises. The police barred MacCalister from the Shaw's and told Shaw's that they had interacted with her before but provided no further details.

During MacCalister's ban, Shaw's employees called the Saco police to enforce the ban against her. After MacCalister returned from the ban in 2012, DeRoche requested that Loss

- 18 -

Prevention watch MacCalister to ensure that she was not shoplifting. McCourt observed MacCalister four or five times between 2012 and 2014 and never observed her acting strangely or shoplifting. Other employees had also heard rumors MacCalister shoplifted but they never saw her shoplifting either.

Between 2010 and 2015, Shaw's employees observed MacCalister in the Saco Shaw's wearing baggy, black or camouflage clothing and with a shaved head. She rarely spoke to them and they described her as "weird," "strange," "quiet," and "shy." Schaffer recalled that MacCalister sometimes exhibited "big" eyes. She thought that MacCalister's appearance and demeanor might make some people feel "threatened" but she had only felt "uncomfortable" or "awkward." In 2015, Wood had heard customers make comments such as "what's with her" and "she seems weird." In June or July 2015, Surran told Lavoie that "something's wrong with [MacCalister]" and that she was scared of MacCalister.

On the day of the murder, August 19, 2015, MacCalister entered Shaw's twice. The first time, she purchased several items, gave Doyle a "smirk" while checking out, and then sat for five minutes nearly on the automatic door sensor. She then returned to Shaw's three hours later and walked back and forth in the aisles.

These facts did not make it foreseeable that MacCalister posed a danger to other customers. As to the smoking incident, Shaw's acted promptly in seeking police help to deal with the

- 19 -

situation. Further, this incident occurred four years before the murder and there was no intervening concerning behavior from MacCalister between that incident and the summer of 2015.

The only other information provided to Shaw's about MacCalister by a customer was Surran's statement to Lavoie, a cashier, in June or July 2015. Surran told Lavoie that "something's wrong" with MacCalister and that MacCalister scared her. But Surran did not report MacCalister's actions to a supervisor, she did not request that the store do anything about the incident, and she did not provide Lavoie with any particulars about what MacCalister had done. People are scared of many things short of violent physical attacks. Further, Lavoie was familiar with both Surran and MacCalister and explained that based on her experience as a cashier, she would have picked up on the fact that a customer was uncomfortable or defensive. But here she did not. These facts did not make MacCalister's attack foreseeable.

Indeed, no Shaw's employee ever saw MacCalister act violently, raise her voice, or threaten someone in the Saco Shaw's. Nor was Shaw's aware of MacCalister's behavior outside of Shaw's. The fact that MacCalister's appearance was perceived as "strange," that Schaffer felt "awkward" or "uncomfortable" around her, and that MacCalister rarely responded when spoken to did not make her violent attack on another customer foreseeable. Weird clothing and affect were not uncommon among the store's many customers.

As to shoplifting, Shaw's investigated and saw none, so shoplifting provides no basis for any theory that violent behavior is associated with shoplifting. And since there was no evidence of shoplifting, that provides no basis for any theory of an obligation to do continuous surveillance.

MacCalister's actions on the day of the murder also do not establish that it was foreseeable that she was a danger to other customers. The fact that she gave a "smirk" to the cashier and sat in a strange place for five minutes before leaving does not forecast a violent attack. Further, walking back and forth is not out of the ordinary in a grocery store.

Even assuming favorably to Boudreau that a Shaw's employee should have observed the incidents involving Corriveau and Belanger, neither made it foreseeable that MacCalister was a danger to other customers. As to the incident with Corriveau, MacCalister did not threaten, or even speak, to Corriveau. To a reasonable observer, MacCalister would have appeared to be shopping the Saco Shaw's by walking across the store from the ice cream aisle to the produce section. As to the incident with Belanger, even if Belanger considered the "lunge" to be a threat, MacCalister was across the entire store and did not get any closer to Belanger. These facts do not make the violent assault of

another customer foreseeable.[7]

Boudreau seems to argue further that Shaw's' internal policies and procedures for deterring shoplifting gave rise to a legal duty to abide by those policies, and that the store's alleged failure to do so constituted a breach of duty. He highlights the fact that the store's Loss Prevention Specialist Manual instructs associates to watch individuals wearing baggy clothing or clothing that is inappropriate for the weather, individuals who carry backpacks, those who do not have hand baskets or carriages, and those who linger in the store, even if the suspected shoplifter is never seen shoplifting. The policy advises associates to "[g]reet customers" and "[o]ffer assistance to customers" in order to deter shoplifting. Boudreau emphasizes that the manual states that

_____

[7] Boudreau analogizes his case to Mu v. Omni Hotels Management Corp., 882 F.3d 1 (1st Cir. 2018). But not only does that case apply Rhode Island law, it does not support his theory. Id. at 5. In Mu, the court reversed a grant of summary judgment to the defendant-hotel, concluding that a jury could find that the plaintiff's harm, which was caused by an angry mob on the hotel's premises, was foreseeable. Id. at 9-12. The court pointed out that prior to the attack, the mob had been thrown out of the hotel for causing a disturbance, returned to the hotel the same night, fought among themselves, and then attempted to fight a passerby by yelling racial slurs, all of which was observed by hotel employees. Id. at 9-10. Here, MacCalister was never seen acting violently or attempting to start a fight and was banned from the Saco Shaw's four years earlier, in contrast to Mu where the attackers were banned the night of the attack. Id. at 4. Gould v. Taco Bell, 722 P.2d 511 (Kan. 1986), is similarly distinguishable because the attacker, a patron of Taco Bell who attacked another customer, had been involved in a similar altercation two weeks earlier. Id. at 514.

- 22 -

shoplifters can "create a serious risk for customers and associates" and "[s]hoplifters may be armed, under the influence of drugs, violent or pose other risks."

Boudreau's reliance on Shaw's' purported violation of its own loss prevention policies is misplaced. He has provided no authority for the proposition that the store's internal shoplifting policies created a duty under Maine law that the store must watch every customer suspected of shoplifting to ensure that they do not violently attack other customers. Maine law is clear that for a duty to be imposed, the harm must be foreseeable, and here it was not. Further, Shaw's did watch MacCalister and there is no basis to think that any deviations from the policy foreseeably would cause harm to customers.[8]

B.   The District Court Did Not Err in How It Viewed the Facts

Boudreau separately argues that the district court failed to resolve genuine disputes of fact in his favor by disregarding the following facts: that "police specifically told . . . DeRoche they had a history with" MacCalister, that "employees of Shaw's called the Saco PD to report they were concerned about [MacCalister] being in the store," that DeRoche's "scary movie" comment could mean that he believed MacCalister had a propensity

---

[8]   As the district court stated, Shaw's' loss prevention policies may be relevant to causation. But as Shaw's did not owe a duty here, we need not reach this issue.

for violence, that Schaffer stated some customers felt threatened by MacCalister's demeanor, and that Surran may have told a Shaw's cashier that she was "stalked" by MacCalister.

This argument fails.  The district court was required to take the record in the light most favorable to Boudreau but that does not mean that it was required to draw inferences that lacked factual support.  Each fact that Boudreau has singled out as being inappropriately resolved in the defendant's favor was accurately recounted by the district court and based on the record.

First, as to what the police told DeRoche, the district court correctly recounted that DeRoche stated that the police did not say "anything specific at all" to him about MacCalister.  As to the phone calls involving the Saco police, the district court appropriately disregarded the calls that were too broad to be tied to MacCalister and did consider the police dispatcher's statements about the two calls made by Shaw's.  Next, in making the "scary movie" comment, DeRoche made no reference to violence.  So, the district court did not err by stating that no one at Shaw's stated that they believed MacCalister was violent.  Further, the district court did not "overlook" Schaffer's comment but rather accurately described how she thought some people "probably felt threatened" by MacCalister's demeanor and appearance.  Finally, the district court correctly stated that there was no evidence that Surran told Lavoie that MacCalister "stalked" her.

C.    Evidentiary Issues

    1.    The Plaintiff's Expert Witness

        Boudreau argues that "it was reversible error for the district court to overlook the expert witness opinion of Stephen Melia on summary judgment."  He asserts that the district court erroneously "drew its own conclusions about [Shaw's'] obligations in the field of loss prevention and retail security."[9]

        Boudreau mischaracterizes the district court's treatment of Melia's expert opinion.  The district court did not draw its own conclusions about the field of retail security but rather explained that Melia's opinion about Shaw's' purported breach of retail security protocols was not relevant to the duty analysis under Maine law.  As said, there is no authority for the proposition that a store's own loss prevention policies give rise to a duty absent foreseeability.

        Boudreau also asserts that "Melia testified that Shaw's owed a duty to prevent [MacCalister] from causing harm to customers" and that the district court should have accepted this conclusion.  It is not clear that Melia's opinion makes such a claim, as its primary focus seems to be that Shaw's violated standard retail security procedures, not that such procedures

---

        [9]    We assume that the evidence considered at summary judgment was admissible as it does not change our conclusion that Shaw's did not owe Wendy Boudreau a duty.

created a legal duty under Maine law. But even if Melia's opinion makes such a claim, Boudreau's argument would fail because the presence of duty is a legal question to be resolved by the court, not an expert. Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997).

2. Spoliation

At the district court, Boudreau moved for sanctions against Shaw's for spoliation of evidence consisting of the security camera footage from the store for the weeks leading up to the murder.[10] He sought "a permissive negative inference, both on summary judgment and before the jury" about the contents of the footage. The district court applied Rule 37(e), which states that "upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The district court was "doubtful there [was] any prejudice" because "[a]t most, the missing video might [have] provide[d] images of what certain customers say they observed about MacCalister at Shaw's before the day of the murder." The court then stated that it would "assume that MacCalister was in the store virtually every day, and that she always dressed the same way and exhibited the

---

[10] The parties learned of the footage's existence after the 2018 deposition of McCourt. When McCourt was asked to retrieve the footage, it could not be located.

- 26 -

same mien . . . [and] that she had encounters with customers as they describe[d] the encounters" and that this would "cure[] any prejudice."

We review the district court's denial of sanctions for abuse of discretion. See Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 41-42 (1st Cir. 2017). We see none. The district court followed the guidance in the advisory committee notes for assessing prejudice and evaluated the missing video's importance to the litigation by concluding that at most, it "might provide images of what certain customers say they observed about MacCalister." Further, as the district court stated, even if the video showed what Boudreau argues it could have shown, summary judgment still would have been appropriate because the incidents involving Corriveau and Belanger did not make MacCalister's attack foreseeable, even if they had been observed by Shaw's employees.[11]

Affirmed.

---

[11] Boudreau asserts that the video would show "who was telling the truth" in the interaction between Surran and Lavoie. This argument is meritless because the statements of Surran and Lavoie are not contradictory.